UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHELLE SROKA,

    Plaintiff,

v.

WAL-MART STORES EAST, LP,

    Defendant.

Case No. 16-10149
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

**OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [45]**

Michelle Sroka was shopping at her local Walmart when a man assaulted her. The man, seemingly shopping with his family, repeatedly hit Sroka with his fists and a metal cane. The assault lasted a matter of seconds. Minutes after the assault occurred, emergency personnel responded.

In time, Sroka sued Walmart, arguing Walmart breached its duty to reasonably expedite police involvement. In response, Walmart says it did everything possible to meet its standard of care once it had notice of the assault. And, for the following reasons, every reasonable jury would agree with Walmart.

**I.**

**A.**

Michelle Sroka says her Walmart experience started out perfectly normal. Wanting chip dip, she entered a Walmart store in Livonia, Michigan around 7:01 pm and went straight to the dairy section. (R. 81, PageID.2509.) About two minutes later, video footage first shows an African American man accompanied by what Sroka presumed was his family: two young

children, a woman pushing a cart, and a baby in the cart's seat. (R. 81, PageID.2509; R. 45, PageID.572.) They were shopping—nothing unusual for a Walmart. (R. 45, PageID.569, 572.) The man was tall and wore black pants with a red sweater. (R. 45, PageID.569.)

Sroka first encountered the man when she made it to the dairy section. (R. 45, PageID.568.) She says she never made contact with him or any of his family members, never looked at him the wrong way, and did not speak to him. (R. 81, PageID.2510; R. 45, PageID.572, 595.) At most, she admits she might have "walked between merchandise and him" without saying excuse me. (R. 45, PageID.595.) In any event, Sroka remembers thinking that, as she walked passed him, he said something unintelligible. (R. 45, PageID.573.) And wondering if the man was addressing her, she turned around. (R. 45, PageID.573.) At that moment, around 7:07 pm, the man knocked her into the dairy case and began beating her with his fists and a metal cane. (R. 45, PageID.573–575.)

The assault lasted maybe a minute. (R. 45, PageID.576, 588.) There were no managers or employees around. (R. 45, PageID.573.) When the man stopped hitting Sroka, he gathered his family and ran out of the store down the main aisle. (R. 45, PageID.576.) Cameras show the assailant leaving the Walmart around 7:09 pm. (*Id.* at PageID.588.) The assault left Sroka bloodied in the dairy case, but she quickly recovered and pursued her attacker out of the store fifteen to twenty seconds later. (R. 45, PageID.576, 588, 643, 686.)

In recounting those seconds after the assault, Sroka's account takes a few twists and turns. Sroka remembers being alone with her assailant in the dairy section. (R. 45, PageID.573.) But the commotion must have attracted people because, as she was regaining her composure, she remembers seeing witnesses. (R. 45, PageID.576.) First, Sroka recalls an "Asian guy" coming up

2

to her to say he was calling the police. (*Id.*) Then she remembers the "Asian guy" following her assailant out of the store. (*Id.*)

Eventually, Sroka picked herself up and also chased after her attacker. (R. 45, PageID.579.) And as she was running down the aisle after him, she remembers seeing two Walmart employees—a pair of "black females." (R. 45, PageID.580.) Video surveillance does not capture this interaction, but Sroka says she was "yelling" at the employees to help her while she ran after her attacker. (*Id.*) She never came to a complete stop, but she "yielded" for "a second, maybe three" and "in plain English" asked the two Walmart employees for help. (*Id.* at PageID.583, 581.) Sroka believes the employees understood her, even though they did not respond: "if I make eye contact with you and you look like you speak English, in my mind you understand what I'm saying." (*Id.* at PageID.583.) But she admitted, she cannot be sure they knew what she was saying. (*Id.* at PageID.582.)

After yelling at the women she believed were employees, Sroka ran out of the store after her assailant. (R. 45, PageID.584.) And by this point she had already dialed 911. (*Id.*) To the 911 dispatcher, she relayed a "play-by-play" of the assault as she pursued her assailant through the nearby neighborhood. (*Id.*) She does not remember how long it took, but in short order, police arrived and, says Sroka, after a brief struggle, convinced her to stop chasing her assailant. (R. 45, PageID.585.) Sroka urged the officer to continue the hot pursuit (*id.*), but eventually agreed to receive treatment for her injuries (R. 45, PageID.588).

Witness accounts corroborate some of Sroka's story. The "Asian guy" was James Richards and he was shopping at Walmart that night. (R. 45, PageID.633.) In the ten minutes prior to the assault, he remembers a normal Walmart experience. (R. 45, PageID.633.) But eventually he came upon Sroka and her assailant. (R. 45, PageID. 630, 631.) In the corner of the

3

dairy aisle, he saw an African American male wearing a red sweatshirt hitting a woman with a cane and he saw blood on the woman's face. (R. 45, PageID.631, 630.) There were shoppers around, but no Walmart employees in the area. (R. 45, PageID.632.)

Richards yelled. He maybe said something like "what are you doing" and the assailant "turned around" and started walking toward the exit. (R. 45, PageID.633.) Richards immediately approached Sroka in the dairy case, saw nobody in the area, and told Sroka he was calling 911. (R. 45, PageID.633–634.) He dialed 911 and followed the assailant out of the store, all the while relaying details of the assault to the 911 dispatcher. (R. 45, PageID.634–635.) On his way out of the store, Richards told a man wearing a vest to help the woman in the dairy case. (R. 45, PageID.643.) Richards continued to speak with the 911 dispatcher outside the store, even as the assailant briefly confronted him. (R. 45, PageID.635.) Eventually, the assailant ran off. (*Id.*) A "little while" later, Richards was there when the police arrived. (*Id.*)

Meanwhile, just prior to the assault, the store's co-managers were in a back office. (R. 45, PageID.795.) Sometime after 7:00 pm, James Barton and Lori Oaks received a "code white" for the dairy section. (*Id.*) A product of the store's internal policies, a "code white" goes out when a customer requires medical attention. (*Id.*) Barton and Oaks arrived in the dairy section almost at the same time and saw blood on the floor and elsewhere. (R. 45, PageID.796, 815.) A customer—not a Walmart employee—told them an assault had occurred, the assailant and victim had already left, and a witness had already called police. (R. 45, PageID.796, 815.) So Barton and Oaks agreed to verify that police had been called, but at that moment, as Oaks was going for her phone, police walked into the store. (R. 45, PageID.796, 815.) Barton and Oaks stayed in the dairy section until police "documented everything" and collected evidence. (R. 45, PageID.796, 815–816.)

A number of Livonia Police Officers responded to the 911 calls. (R. 45, PageID.829, 831; R. 81-16.) Two to three minutes after receiving the calls, Officer Paul Walters found Sroka at an address in the neighborhood near the Walmart. (R. 45, PageID.830.) Walters does not remember Sroka chasing anyone when he arrived, and he did not see the suspect anywhere. (*Id.*) Instead, Walters remembers Sroka saying she was shopping for chip dip when a man "said something to her twice." (*Id.*) Walters remembers Sroka saying she responded and the man "got in her face and was screaming at her and spit at her," and after Sroka pushed the man away, he attacked her.[1] (*Id.*) Once paramedics tended to Sroka, Walters drove to the Walmart where he spoke with employees, reviewed footage, and directed the employees to preserve the video. (*Id.* at PageID.831.) Walters said Walmart employees did everything he asked of them. (R. 45, PageID.832.)

Evidence reviewed after the fact also corroborates only some of Sroka's account. Sergeant Joshua Gilbert was the Livonia Police detective in charge of the investigation. (R. 45, PageID.684, 685.) Gilbert reviewed the 911 calls, and the log shows Richards' call came in around 7:09 pm, followed by Sroka's call less than two minutes later.[2] (R. 45, PageID.688.) According to Gilbert, on the recording of her 911 call, Sroka told the dispatcher that her assailant "got in her face" and said Sroka "shouldn't be looking at him." (R. 45, PageID.689.) Gilbert also received and reviewed the "unedited video" from Walmart. (R. 45, PageID.693.) And in reviewing the video, Gilbert never saw any Walmart employees near the assault. (R. 45, PageID.690.)

---

[1] Walter's incident report says much the same. (R. 45-5.)
[2] In different databases, the first 911 call is recorded anywhere from 7:08 to 7:10. (R. 45, PageID.698.) Sergeant Gilbert explained that to the best of his knowledge the discrepancy is the result of different recording methods across the databases. (*Id.*)

5

Tracey Simon was the store's manager at the time. She made plain that her staff knew to call the police if the police needed to be called. (R. 45, PageID.768.) She was off that night, but Barton (one of the two, on-duty co-managers) called her around 7 pm to tell her an assault happened in the store. (R. 45, PageID.740.) The next morning, Simon reviewed the tapes and noted that the actual assault occurred in the camera's blind spot. (R. 45, PageID.741.) The blind spot was the product of a temporary chip display blocking a full view of the dairy section. (R. 45, PageID.742.) Nationally, Walmart was pushing a chip display to coincide with football season; locally, Simon decided to put the chip display next to the chip dip. (R. 45, PageID.741–742.) But even with the blind spot, Simon could still tell that no "team members" were near Sroka when the assault happened. (R. 45, PageID.751, 754.) And as all Walmart employees were required to follow a dress code, Simon was able to discern that none of those around Sroka after the assault were an employee, as none were dressed to code. (R. 45, PageID.762.) Finally, Simon made sure that the police had everything they needed. (R. 45, PageID.773.)

**B.**

About a year after the assault, Sroka sued Walmart. (R. 1, PageID.2.) Sroka brought one count of negligence on the theory that Walmart "disregarded" its duty to reasonably expedite police involvement. (*Id.* at PageID.17.) And she sought exemplary damages because Walmart's alleged deliberate indifference led Sroka to "protect herself by taking all matters into her own hands to attempt to apprehend the assailant." (R. 1, PageID.19.)

After lengthy discovery, Walmart moved for summary judgment. (R. 45.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## III.

### A.

As a baseline rule, "merchants 'do not have a duty to protect their invitees from unreasonable risks that are unforeseeable.'" *MacDonald v. PKT Inc.*, 628 N.W.2d 33, 38 (Mich. 2001) (quoting *Mason v. Royal Dequindre, Inc.*, 566 N.W.2d 199, 203 (Mich. 1997)). Only when a "readily identifiable" invitee is "foreseeably endangered" does a merchant, like Walmart, owe any duty to an invitee, like Sroka. *Id.* (internal quotations omitted). And "because, as a matter of public policy, we should not expect invitors to assume that others will disobey the law," a merchant's duty "is limited to responding reasonably to situations occurring on the premises." *Id.* at 39. Responding reasonably means "reasonably expedit[ing] the involvement of the police." *Id.* at 40.

Walmart insists it did not breach that duty. Sroka was the victim of a terrible crime. (R. 45, PageID.541–542.) But a terrible crime that Walmart never saw coming. (R. 45, PageID.541.) So the store's only duty to Sroka was to reasonably expedite police involvement, which it did. (R. 45, PageID.543.) And exemplary damages are not warranted because Walmart never stood in the way of the police investigation. So Sroka cannot succeed on her claims.

Sroka disagrees, but on the undisputed record, even when viewed in the light most favorable to Sroka, Walmart succeeds in showing it did not breach its duty to her. And even if Walmart did breach, the breach did not cause her injury.

7

Start with when Walmart's duty arose. Walmart had no duty to "anticipate the criminal acts of third parties" and so no duty to keep security guards at the store. *MacDonald*, 628 N.W.2d at 41. Instead, the store's duty was "triggered by specific acts occurring on the premises that" signaled "a risk of imminent and foreseeable harm" to Sroka. *MacDonald*, 628 N.W.2d at 40–41. Only a "present situation" counted toward "specific acts" posing a risk of "imminent and foreseeable" harm. *Id.* And the assault was the first, and only, "present situation" on the premises. Sroka admits all was normal prior to the assault. (R. 81, PageID.2509.) She went straight to the dairy aisle. She never made contact with the man prior to the assault. And the man was shopping with his family—perfectly normal behavior in a Walmart. Then the assault occurred. So reasonable minds can only agree that Walmart's duty arose once the assault started. *See id.* at 41.

Next turn to the speed with which police were called. The assault lasted maybe a minute. (R. 45, PageID.576, 588.) Sroka agrees no employees witnessed it. (R. 45, PageID.573; *see also* R. 45, PageID.632, 690, 751, 796.) And Sroka remembers Richards calling 911 seconds or minutes after the assault. (R. 81, PageID.2514.) Richards' deposition testimony and police reports memorialize the prompt timing of his call. (R. 45, PageID.634–635, 688.) So, crucially, on the undisputed record, Richards called 911 before any Walmart employee knew of the assault.

At the earliest, on Sroka's account, Walmart learned of the assault when Sroka encountered the pair of employees on her way out of the store. Sroka says the employees did nothing, although she cannot be sure because she immediately ran out of the store. Soon after she left, the co-managers, Barton and Oaks, responded to a "code white" in the dairy section. (R. 81, PageID.2518.) So someone at Walmart took prompt action—they issued a "code white." When Barton and Oaks got there, all they saw was blood on the floor. (R. 45, PageID.796.) Customers

8

told them an assault went down and the people involved left the store. (*Id.*) And the customers said a witness called the police. (*Id.*) Barton and Oaks agreed to verify whether the police were in fact called, but, at that moment, police arrived in the store. (*Id.*) There is no dispute that the police were called. There is no dispute that the police arrived at Walmart. And while Sroka does not believe them, Barton and Oaks both testified that they had decided to contact the police. (R. 45, PageID.815, 796.)

At bottom, Walmart did not breach its duty to reasonably expedite police involvement. Sroka tries to make a mountain out of asking the pair of unidentified employees for help. At that time, Sroka herself was calling the police and fleeing the store after her attacker. So it is unclear what she believes these employees should have done. And the mere fact that the pair could have called police moments before other Walmart employees, Barton and Oaks for example, means Sroka's encounter with the pair does not implicate a breach. *See Harshaw v. Classic Coney Island*, No. 291980, 2010 Mich. App. LEXIS 2307, at *2 (Mich. Ct. App. Dec. 2, 2010) (reasoning that a merchant does not breach simply because one employee could have called police sooner than another employee). Moreover, just as Barton and Oaks were about to call 911, police arrived. And Walmart's duty to Sroka did not obligate it to go through the motions of calling 911 when police were already on the scene. *See Mouzon v. Achievable Visions*, 864 N.W.2d 606, 609 (Mich. Ct. App. 2014) (holding that a merchant fulfills its duty to reasonably expedite police involvement where police arrive before any employee has a chance to call 911). Thus, on the undisputed record, no reasonable jury could find that Walmart breached its duty to Sroka.

**B.**

For her part, Sroka urges the Court to let a jury decide what happened in that Walmart. She says circumstantial evidence proves Walmart actively destroyed evidence, including videos, to conceal an "organized attempt to murder plaintiff by many people," including Walmart employees. (R. 81, PageID.2516; *see also* R. 81, PageID.2509–2511, 2513.) At her deposition, Sroka offered her take: the whole thing was an African-American man's attempt to "beat up, knock out, kill" a "single white female" possibly as part of a "[g]ang-related initiation" allowing the dad to "show[] the kids how things are done." (R.45, PageID.607; R. 81, PageID.2510.) And Walmart's co-managers, Barton and Oaks, were in on it because, she thinks, they did nothing for 20 minutes after the assault. (R. 81, PageID2519.) Walmart wanted to cover-up the assault because Sroka's assailant may have been an "unknown" Walmart employee. (R. 81, PageID.2509.) So, says Sroka, genuine issues of material fact preclude summary judgment on the negligence claim and the conspiracy means she deserves exemplary damages.

The Court disagrees.

Sroka thinks the facts show Walmart employees delayed police involvement. She takes Barton and Oaks at their word when they say police walked in the door the moment they were about to call 911. (R. 81, PageID.2519.) But Sroka insists that happened 20 minutes after the assault. (R. 81, PageID.2519.) She points to the Livonia Police run sheet showing Officer Walters arrived at the Walmart roughly 20 minutes after the assault. (R. 81-16.) As Walters was the first officer to report Walmart as his location, Sroka thinks Walters must have been the first officer to arrive at the Walmart. (*Id.*) So he must have been the officer Barton and Oaks saw come through the door, and the co-managers must have intentionally decided to do nothing for

20 minutes after the assault. (R. 81, PageID.2518–2519.) This does not create a genuine issue of material fact as to breach of duty.

First, Walters was not the only police officer to arrive at Walmart. Indeed, Walters remembers several units responding to the calls that night, Officer Aaron Ruber among them. (R. 45, PageID.830, 831.) Ruber was in a patrol car that night and has some memory of going to the scene, possibly as the crime scene investigator. (R. 81, PageID.3010.) And the run sheet corroborates Walters' memory: it documents a flurry of police and EMS activity around the time of the assault. (R. 81-16.) Plus, Richards remembers speaking with police when they arrived at the store a "little while" after he called 911. (R. 45, PageID.635.)

Second, even if Walters was the first to arrive, and one line on his run sheet confirms his arrival just after 7:30 (R. 81-16), that does not create a genuine issue of fact that Walmart failed to "reasonably expedite" police involvement. *See Lamar v. Ramada Franchise Sys.*, 738 N.W.2d 232 (Mich. 2007) (finding no genuine issue of material fact "as to whether the defendants took reasonable measures to respond" even though plaintiff disputed "when a fight started and how long it had been going on before the defendants' employees contacted the police"). Again, the remainder of the undisputed record is that a customer immediately contacted the police. So did Sroka. Barton and Oaks immediately responded to a code-white. They went to the scene of the assault. A customer advised them about what happened and that police had been called. They conferred about what to do. They decided to confirm that the police had been contacted. Within minutes the police arrived. That their actions may have taken approximately 15 to 20 minutes, in a case where the police had already been called, does not preclude summary judgment. *See Harshaw*, 2010 Mich. App. LEXIS 2307 at *2.

And even if the Court were to find a fact issue on breach, there is nothing in the record to support that a 15- to 20-minute lag in Walmart contacting the police caused Sroka's injuries. Causation requires Sroka to, at least, show "the harmful result would not have come about but for the defendant's negligent conduct." *Haliw v. Sterling Heights*, 627 N.W.2d 581, 588 (Mich. 2004). Sroka says the "harmful result" is the physical and psychological effect of the assault. (R. 1, PageID. 18–19.) But the assault had been perpetrated well before the time Sroka says Barton and Oaks delayed. And immediately after the assault, both Richards and Sroka called 911. Walters found Sroka within two to three minutes of those calls reaching dispatch (R. 45, PageID.830), and EMS followed shortly after (R. 81-16). So, on the undisputed record, Walters walked into the Walmart at 7:30 because he had already responded to Sroka in the neighborhood near the store. (R. 45, PageID.831.) Even assuming a breach, then, Sroka cannot show the breach caused her any harm.

Finally, Sroka tries to create a dispute over whether her assailant was actually a Walmart employee. Sroka admits the assailant was not wearing a Walmart uniform. (R. 81, PageID.2509.) Undeterred, however, she speculates he might have been a "floor walker"—a type of Walmart employee that did not always wear uniforms. (R. 81, PageID.2509.) But Sroka's speculation and conjecture, in addition to being legally insufficient, runs headlong into the undisputed testimony of store manager Tracey Simon. Simon says her store did not employ floor walkers. (R. 45, PageID.732.) And Simon adhered to a strict dress code for staff. (R. 45, PageID.762.) Having watched the store's video footage of the attack, she says that anyone in the videos dressed out of code was not an employee—including Sroka's attacker. (*Id.* at PageID.762, 751, 754.) Sroka does not quibble with Simon's testimony, so the undisputed record establishes Sroka's assailant was not a Walmart employee.

In sum, Sroka cannot point to a genuine issue of material fact on her negligence claim.

## C.

That leaves exemplary damages.

Mainly, Sroka thinks Walmart intentionally participated in—or covered up—a plot to murder Sroka. (R. 81, PageID.2516.) She admits she has no "direct evidence" of anything. (R. 81, PageID.2513.) But she says the circumstantial evidence is damning: videotapes are missing, witness lists were not preserved, the attacker knew when and where to strike, and Walmart employees served as lookouts or worse. (R. 81, PageID.2513, 2510–2512.) All of the above left Sroka to resort to self-help in order to find her attacker. So exemplary damages are appropriate.

But without a viable negligence claim, Sroka is not entitled to any damages. Equally problematic, exemplary damages require Sroka to establish, in part, that Walmart's "conduct was malicious or so willful and wanton as to demonstrate a reckless disregard of [Sroka's] rights." *Ramik v. Darling Intern., Inc*., 60 F.Supp. 2d 680, 684–85 (E.D. Mich. 1999) (citing *Veselenak v Smith*, 327 N.W.2d 261, 264 (Mich. 1982)). But "the very fact that [Sroka's] only triable claim was for common-law negligence, rather than an intentional tort, negates the mental element required for an award of exemplary damages." *Ruth Jarrett-Cooper & Exclusive Events & Accomodations v. United Airlines*, No. 330248, 2017 Mich. App. LEXIS 1479, at *31 (Mich. Ct. App. Sept. 19, 2017) (citing *Veselenak*, 327 N.W.2d at 264). Therefore, Sroka is not entitled to exemplary damages.

## IV.

In sum, summary judgment for Walmart is appropriate. Sroka cannot establish that Walmart breached the duty of care or that any breach caused her injury. And she fails in her attempts at creating a fact issue. Plus, Sroka cannot establish entitlement to exemplary damages.

Accordingly, the Court GRANTS Walmart's motion for summary judgment (R. 45.) The case is dismissed.

SO ORDERED

Dated: September 20, 2018                 s/Laurie J. Michelson
                                                U. S. DISTRICT JUDGE

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 20, 2018.
+
                                           s/Teresa McGovern
                                           Case Manager Generalist